******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v*. CHIHAN ERIC CHYUNG
(SC 19375)

Rogers, C. J., and Palmer, Eveleigh, McDonald, Espinosa, Robinson and Vertefeuille, Js.

*Argued January 18—officially released April 18, 2017*

*Conrad Ost Seifert*, assigned counsel, for the appellant (defendant).

*David J. Smith*, senior assistant state's attorney, with whom, on the brief, was *Michael Regan*, state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. The primary issue that we must decide in this appeal is whether the trial court properly denied the defendant's motion for a judgment of acquittal and for a new trial after the jury rendered legally inconsistent guilty verdicts on charges of murder and of manslaughter in the first degree with a firearm. The state charged the defendant, Chihan Eric Chyung, with murder in violation of General Statutes § 53a-54a and manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a)[1] in connection with the shooting death of his wife, Paige Chyung (victim). After a trial, the jury rendered verdicts of guilty on both charges. Thereafter, the defendant filed a motion for judgment of acquittal and for a new trial contending that the verdicts were legally inconsistent because, to convict the defendant of murder, the jury had to find that he had a specific intent to kill the victim, whereas, to convict him of manslaughter in the first degree, the jury was required to find that he acted recklessly. The trial court denied the motion on the ground that the defendant had waived the claim by failing to request a jury instruction that he could not be convicted of both charges. The trial court also concluded, however, that the verdict of guilty on the manslaughter charge must be vacated pursuant to case law holding that, when a defendant is convicted of both a greater offense and a lesser included offense, thereby violating constitutional double jeopardy principles, the proper remedy is to vacate the conviction on the lesser included offense. After vacating the guilty verdict of manslaughter in the first degree with a firearm, the trial court sentenced the defendant to forty years imprisonment on the murder charge. This appeal followed.[2] We conclude that the trial court improperly determined that the defendant had waived the claim that the guilty verdicts on the charges of murder and manslaughter in the first degree with a firearm were legally inconsistent by failing to request a jury instruction on the issue. Rather, we conclude that legally inconsistent verdicts involve jury error that may be raised for the first time after the verdicts have been returned or on appeal. Because we conclude that the verdicts were legally inconsistent, and because there is no way for the trial court or this court to know which charge the jury found to be supported by the evidence, neither verdict can stand. Accordingly, we conclude that both guilty verdicts must be vacated and the case must be remanded to the trial court for a new trial.

The jury reasonably could have found the following facts, which support either the guilty verdict on the charge of manslaughter in the first degree with a firearm or the guilty verdict on the charge of murder. The defendant testified that he and the victim, who were married in May, 2009, lived at 257 Norwich Avenue in Norwich.

According to the defendant, on the evening of June 2, 2009, they had an argument about the victim's purchase of new tires for her truck. The victim was upset because the defendant told her that she had paid too much for the tires. She left the residence, telling the defendant, "I can't care if you're here when I get back." The defendant and the victim then had several telephone conversations, during which they continued to argue. The defendant ultimately decided that he should leave the residence and he packed a bag with his belongings. He then placed the bag by the kitchen door and waited for the victim to return.

The defendant testified that the victim returned to the residence at about 7:30 p.m. The defendant and the victim continued to argue, and the defendant decided that he would leave and go to a friend's house in New Haven. He then retrieved his pistol from a nightstand in the second floor bedroom and brought it downstairs to the kitchen, intending to pack it in his bag. He put the bag on the kitchen table and, as he attempted to open the bag by pulling on the zippers, the gun discharged. The defendant testified that he had not known that the gun was loaded. After the gun fired, the defendant looked up and saw the victim, who looked scared. She then fell to the floor. Believing that the victim was dead, the defendant grabbed his bag, went to his truck and drove away from the residence.

As he was driving, the defendant called a friend and told him that the victim had been shot. The friend told the defendant that he should return to the residence and call 911. The defendant then drove back to the residence, called 911 while still in his truck and reported that he had shot the victim.

Thomas Lazzaro, a patrol officer with the Norwich Police Department (department), testified that he and other members of the department responded to the defendant's 911 call. Upon arriving at the defendant's residence, the police arrested him. They kicked in the door to the residence and found the victim's body on the kitchen floor. Lazzaro observed that the house was in disarray and that items were "thrown all over the place . . . ." In the living room, the victim's purse was on the floor and its contents were strewn "all over the area." Pieces of a broken ice cube tray were found scattered around the first floor and, in the second floor bedroom, Lazzaro observed a broken ashtray.

Damien Martin, a patrol officer with the department, testified that, after the defendant was given a *Miranda* warning[3] at the scene of the shooting, he was asked what had happened. The defendant stated that he and the victim had an argument about a fishing pole that he had purchased because the victim was upset about the expense. He also stated that he had been drinking. After deciding to leave the residence, he packed a suitcase and put it on the kitchen table. He then decided

to pack his handgun. As he attempted to put the gun into the suitcase, it accidentally fired and struck the victim.

Amber Levesque testified that she and her boyfriend, Richard Hernandez, lived in an apartment in a building next door to the defendant's residence on the date of the shooting. At approximately 9:30 p.m., she heard a man and a woman arguing in the residence. After approximately twenty minutes, the argument stopped. Levesque then heard the woman scream and, approximately fifteen seconds later, a loud bang. Approximately two minutes after that, she heard a door slam. She then went to bed. Between approximately 11 and 11:30 p.m., Hernandez' mother, who lived in the same apartment, came into the bedroom and said that there were police in front of the defendant's residence. Hernandez testified that, starting at approximately 9:30 p.m., he heard arguing from the defendant's residence that lasted for approximately one-half hour. He then heard a woman scream, followed by a gunshot.

Frank Evangelista, a physician employed by the Office of the Chief Medical Examiner, testified that he performed an autopsy on the victim. During the autopsy, Evangelista observed a gunshot wound to the victim's forehead and multiple areas of blunt trauma, including two bruises on her left chest, an abrasion on her back, and a bruise on each thigh. There was gunpowder stippling around the head wound, indicating that the gun had been one to three feet away from the victim's head when it was fired. An X-ray showed that the bullet had entered the victim's forehead and traveled to the back of her skull, causing her death.

Gregory Danas testified for the defendant as an expert in the handling of firearms. Danas testified that the gun that the defendant had fired was a "model Glock 19 . . . ." He further testified that, on the basis of his discussions with the defendant about the events leading up to the shooting, "any time [a] firearm is handled in that fashion, [there] is a high degree of probability, regardless of who's touching the gun, that that gun is going to go off," and that it was possible that the discharge was accidental.

The defendant was charged in a two count substitute information with murder in violation of § 53a-54a and manslaughter in the first degree with a firearm in violation of § 53a-55a (a). During closing arguments, the state argued that the evidence established that the defendant was guilty of murder because he pointed the gun at the victim and pulled the trigger with the intent to cause her death.[4] The defendant argued that, to the contrary, the evidence showed that the gun discharged because he had handled it carelessly and negligently.

The jury returned verdicts of guilty on both the charge of murder and the charge of manslaughter in the first degree with a firearm. Thereafter, the defendant filed

a motion for judgment of acquittal and for a new trial in which he contended, among other things, that the verdicts were legally inconsistent because the murder conviction required the jury to find that he had acted with the specific intent to cause the victim's death and the conviction on manslaughter in the first degree with a firearm required the jury to find that he had acted recklessly. The trial court denied the motion for a new trial on the ground that the defendant had failed to request a jury instruction that he could not be convicted on both charges. Cf. *State* v. *Kitchens*, 299 Conn. 447, 466, 10 A.3d 942 (2011) (defendant waives claim based on improper jury instruction when "defense counsel acquiesces in the instructions following a meaningful opportunity to review them outside the rush of trial, participates in an on-the-record charge conference designed to allow counsel to identify errors while they still can be remedied and takes no exception after the charge has been delivered"). The court also concluded, however, that, under the circumstances of this case, the charge of manslaughter in the first degree with a firearm was a lesser included offense of the murder charge. Accordingly, the court concluded that, to protect the defendant's constitutional right not to be subject to multiple punishments for the same offense under the double jeopardy clause of the fifth amendment to the United States constitution, the defendant's manslaughter conviction must be vacated. See *State* v. *Polanco*, 308 Conn. 242, 260, 61 A.3d 1084 (2013) ("when a defendant is convicted of greater and lesser included offenses, the trial court shall vacate the conviction for the lesser offense"). Thereafter, the trial court rendered judgment in accordance with the guilty verdict on the murder charge.

This appeal followed. The defendant contends that the trial court improperly denied his motion for a judgment of acquittal and for a new trial on the ground that he had failed to request a jury instruction that he could not be convicted of both the charge of murder and the charge of manslaughter in the first degree with a firearm. The defendant further contends that the guilty verdicts should be vacated because they were legally inconsistent. In addition, the defendant contends that the trial court improperly allowed the state to present certain evidence of uncharged misconduct. We agree with the defendant's position that the trial court improperly declined to review his claim that the verdicts were legally inconsistent and that the verdicts must be vacated. We reject, however, his evidentiary claim.

I

We first address the defendant's claim that his convictions for manslaughter in the first degree with a firearm and murder must be vacated because: (1) they were legally inconsistent; and (2) contrary to the trial court's determination, he was not required to request a jury

instruction that he could not be convicted of both offenses to preserve the issue for postverdict consideration. The following legal principles guide our analysis of this claim. "A claim of legally inconsistent convictions, also referred to as mutually exclusive convictions, arises when a conviction of one offense requires a finding that negates an essential element of another offense of which the defendant also has been convicted. . . . In response to such a claim, we look carefully to determine whether the existence of the essential elements for one offense negates the existence of [one or more] essential elements for another offense of which the defendant also stands convicted. If that is the case, the [convictions] are legally inconsistent and cannot withstand challenge. . . . Whether two convictions are mutually exclusive presents a question of law, over which our review is plenary." (Citations omitted; internal quotation marks omitted.) *State* v. *Nash*, 316 Conn. 651, 659, 114 A.3d 128 (2015).

This court previously has recognized that "the statutory definitions of 'intentionally'[5] and 'recklessly'[6] are mutually exclusive and inconsistent. Reckless conduct is not intentional conduct because one who acts recklessly does not have a conscious object to cause a particular result." (Footnotes added; internal quotation marks omitted.) *State* v. *King*, 216 Conn. 585, 593–94, 583 A.2d 896 (1990), on appeal after remand, 218 Conn. 747, 591 A.2d 813 (1991). Rather, one acts recklessly when one "is aware of and consciously disregards a substantial and unjustifiable risk that [a particular] result will occur . . . ." General Statutes § 53a-3 (13). Thus, a defendant cannot "simultaneously [act] intentionally and recklessly with regard to the same act and the same result, i.e., the injury to the victim." *State* v. *King*, supra, 593. Accordingly, jury verdicts convicting the defendant both on a charge requiring proof of specific intent and on a charge requiring proof of recklessness, with respect to the same act and the same result, are legally inconsistent and cannot stand. Id., 594.

When a jury has rendered legally inconsistent verdicts, there is no way for the reviewing court to know which charge the jury found to be supported by the evidence. Id.[7] Accordingly, the court must vacate both convictions and remand the case to the trial court for a new trial. Id., 595.

In the present case, the jury's verdict of guilty on the charge of murder required the jury to find that the defendant acted with the specific intent to cause the death of the victim. See General Statutes § 53a-54a. On the other hand, the jury's verdict of guilty on the count of manslaughter in the first degree required the jury to find that the defendant acted recklessly. See General Statutes § 53a-55a (a). Because a defendant cannot simultaneously act intentionally and recklessly with respect to the same act and the same result, we con-

clude that the jury verdicts were legally inconsistent.

We further conclude that the trial court improperly determined that the defendant's claim that the verdicts were legally inconsistent could not be raised for the first time in a motion for a new trial, but should have been raised by way of a request for a jury instruction that the defendant could not be convicted of both offenses. The defendant contends that no such instruction was required because the inconsistent jury verdicts were the result of an unforeseeable misapplication by the jury of proper jury instructions.[8] The state contends that, to the contrary, the trial court's determination was correct under *State* v. *Kitchens*, supra, 299 Conn. 466. We conclude that the trial court should have instructed the jury that it could not find the defendant guilty of both offenses and the defendant's failure to request such an instruction did not bar him from subsequently challenging the legally inconsistent verdicts in a motion for a new trial.

The proper procedure for raising a claim that guilty verdicts are legally inconsistent has never been squarely addressed by this court. Our research has revealed no Connecticut cases, however, that support the proposition that, when the state has charged the defendant with two offenses relating to the same act and the same result, and requiring mutually exclusive states of mind, the defendant is required to request a jury instruction that he cannot be found guilty of both offenses in order to preserve the issue of legally inconsistent verdicts for postverdict consideration by the trial court and review on appeal.[9] For the following reasons, we now conclude that the defendant is not required to do so.

This court previously has recognized that "[m]utually exclusive [convictions] are the result of two positive findings of fact that cannot logically coexist." (Internal quotation marks omitted.) *State* v. *Arroyo*, 292 Conn. 558, 584 n.21, 973 A.2d 1254 (2009). Thus, the state and the trial court must be presumed to know both on the basis of logic and on the basis of their legal training that, when the state has tried a case on the theory that the mutually exclusive offenses with which the defendant has been charged relate to the same act and the same result, the jury cannot properly render guilty verdicts on both charges. See *People* v. *Delgado*, Docket No. 13-CA-2024, 2016 WL 7009119, *3 (Colo. App. 2016) (because it is manifestly obvious that defendant may not be convicted on charges that are legally inconsistent, trial court's acceptance of legally inconsistent verdicts is plain error).[10] Accordingly, this situation is distinguishable from the ordinary situation in which a defendant raises an unpreserved claim of instructional error. Ordinarily, such a claim involves a logical and consistent verdict that was based on an *improper* charge. When a jury returns legally inconsistent guilty verdicts, however, it has returned illogical and inconsis-

tent verdicts that were based on a *proper* charge. Therefore, the claim is more properly characterized as involving jury error than instructional error. Cf. *People v. Ousley*, 297 Ill. App. 3d 758, 763–64, 697 N.E.2d 926 (defendant's claim that verdicts were legally inconsistent did not constitute claim of instructional error), cert. denied, 181 Ill. 2d 583, 706 N.E.2d 501 (1998). Accordingly, a defendant's first time, postverdict claim of legally inconsistent verdicts cannot unfairly surprise either the state or the trial court. Cf. *Remillard* v. *Remillard*, 297 Conn. 345, 351–52, 999 A.2d 713 (2010) (rationale for rule requiring preservation of claim at trial before claim will be reviewed on appeal is to prevent "trial by ambuscade, which is unfair to both the trial court and the opposing party").

In this regard, it is significant that, when the charging document and the state's presentation of evidence *are* sufficient to put the defendant on notice that he may be convicted of multiple offenses involving mutually exclusive states of mind on the theory that the offenses relate to different acts or results, we have never required the state to request a jury instruction that the defendant may be convicted of multiple charges in order to avoid unfairly surprising the defendant with multiple guilty verdicts. See *State* v. *King*, 321 Conn. 135, 154, 136 A.3d 1210 (2016) (when charging document and state's presentation of evidence were sufficient to put defendant on notice of state's theory that two charges requiring mutually inconsistent mental states related to different acts and different results, defendant could be convicted of both charges even though "the trial court never explicitly informed the jury that it could deliver a guilty verdict on both charges"); cf. *State* v. *Spikes*, 111 Conn. App. 543, 553, 961 A.2d 426 (2008) ("[w]hen the nature of the crime as charged in the information and the content of the instruction to the jury differ only to the extent that they describe two different methods of committing the same offense, the defendant is able to establish an infringement of constitutional rights only if he can demonstrate unfair surprise or prejudice"), cert. denied, 291 Conn. 901, 967 A.2d 114, cert. denied, 558 U.S. 898, 130 S. Ct. 249, 175 L. Ed. 2d 170 (2009). Under the well established principle that "[w]hat's sauce for the goose is sauce for the gander"; *State* v. *Fernandez*, 5 Conn. App. 40, 52, 496 A.2d 533 (1985);[11] this bolsters our conclusion that, when the defendant has been charged with two offenses requiring mutually exclusive states of mind, the manner in which the state has presented the evidence is sufficient to put *all* parties on notice as to whether the offenses relate to the same act and result. Thus, when the state has tried the case on the theory that multiple mutually inconsistent offenses relate to the same act and the same result, the defendant's first time, postverdict *challenge* to legally inconsistent verdicts cannot result in unfair surprise to the state or to the trial court. Rather, it is the legally incon-

sistent verdicts *themselves* that cause surprise. We conclude, therefore, that a claim of legally inconsistent verdicts is not a claim of instructional error subject to the constraints of *Kitchens*.

Nevertheless, although we conclude that a defendant's first time, postverdict challenge to legally inconsistent verdicts is permissible because it does not result in unfair surprise to the prosecutor and the trial court and because the verdicts are the result of jury error, we also conclude that, to avoid the risk of a jury mistake, the better practice is for the trial court to instruct the jury on the issue in the initial charge.[12] We further conclude that, regardless of whether such an instruction has been given, if the jury renders legally inconsistent guilty verdicts, either the defendant or the state should object to the verdicts before the jury has been discharged, so that the jury may be properly instructed and continue its deliberations.[13] See General Statutes § 52-223.[14]

Because of the important constitutional due process implications of legally inconsistent guilty verdicts, however, we conclude that, even if the defendant and the state have failed to object to the verdicts before the jury is discharged, that failure does not bar the defendant from raising the claim in a motion for a new trial.[15] See *State* v. *King*, supra, 321 Conn. 139 (defendant raised claim of legally inconsistent verdicts by filing motion for new trial); cf. *Ginsberg* v. *Fusaro*, 225 Conn. 420, 426, 623 A.2d 1014 (1993) ("we have never held that a party is obliged to request reconsideration [of the verdict by the jury pursuant to § 52-223] as a prerequisite to challenging the validity of the verdict on a motion to set aside the verdict" in civil case). We conclude, therefore, that the defendant's failure to request a jury instruction that the jury could not find him guilty of both the charge of manslaughter in the first degree and the charge of murder did not bar him from raising the claim in his motion for a new trial.[16] Accordingly, because we have concluded that the guilty verdicts were legally inconsistent, the verdicts must be vacated and the case remanded to the trial court for a new trial. See *State* v. *King*, supra, 216 Conn. 595.

The state makes two arguments in support of its claim to the contrary. First, it contends that the court's ruling may be supported on the alternative ground that the jury reasonably could have found that the defendant did not act both recklessly and intentionally "with regard to the same act and the same result"; id., 593; but that he engaged in two separate acts, one reckless and one intentional, with two separate results. Second, the state contends that, even if both guilty verdicts related to the same act and the same result, the judgment may be affirmed on the alternative ground that the verdicts were not inconsistent because manslaughter in the first degree with a firearm is a lesser included offense of

murder.

We first address the state's contention that the jury reasonably could have found that the defendant engaged in two separate acts with two separate results. Specifically, the state contends that the jury reasonably could have found that: (1) the defendant acted recklessly when handling the gun with the result that the gun discharged and the bullet struck the victim; and (2) the defendant then acted with the specific intent to cause the victim's death when he left the scene without making any attempt to determine whether the victim was still alive or to summon help, resulting in the victim's death. Because, the state contends, the two different mental states did not relate to the same act and the same result, the convictions were not legally inconsistent. See *State* v. *King*, supra, 321 Conn. 142 ("convictions are legally consistent if there is any plausible theory under which the jury reasonably could have found the defendant guilty of both of the offenses that the defendant claims are legally inconsistent" [internal quotation marks omitted]); *State* v. *Nash*, supra, 316 Conn. 666 n.14 ("there is no reason why a defendant may not simultaneously possess two different mental states with respect to a single victim, as long as each mental state relates to a different result").

As the state conceded at oral argument before this court, however, it never presented this theory to the jury during trial.[17] Rather, during the presentation of their respective cases and during closing argument, both the defendant and the state focused exclusively on the defendant's mental state with respect to one act, namely, the firing of the gun, and one result, namely, the bullet striking the victim thereby causing her death. Indeed, when arguing in opposition to the defendant's motion for a new trial, the state expressly conceded to the trial court that "there are not two different acts here. There's one act." Constitutional "[p]rinciples of due process do not allow the state, on appeal, to rely on a theory of the case that was never presented at trial." *State* v. *King*, supra, 321 Conn. 149; see also id. ("the state may not construe evidence adduced at trial to support an entirely different theory of guilt than the one that the state argued at trial"). Accordingly, we reject this claim.

We next address the state's contention that the guilty verdict on the charge of manslaughter in the first degree with a firearm was not inconsistent with the guilty verdict on the murder charge because manslaughter in the first degree with a firearm is a lesser included offense of murder.[18] See *Carpenter* v. *Commissioner of Correction*, 290 Conn. 107, 124, 961 A.2d 403 (2009) ("[m]anslaughter in the first degree . . . is a lesser included offense in a murder indictment" [internal quotation marks omitted]); *State* v. *Rodriguez*, 180 Conn. 382, 405, 429 A.2d 919 (1980) (by being charged with murder,

defendant is on notice that he may be convicted of "lesser included homicides that require a less serious degree of culpable intent," including manslaughter). Accordingly, the state contends, it would not have been possible for the defendant to commit the murder without first committing manslaughter in the first degree. See *State* v. *Tomlin*, 266 Conn. 608, 617, 835 A.2d 12 (2003) (offense is lesser included offense of another offense only when "it is not possible to commit the greater offense . . . without having first committed the lesser" [internal quotation marks omitted]).

We are not persuaded. The issue of whether manslaughter in the first degree is a lesser included offense was first addressed by this court in *Rodriguez*. The issue in that case was whether a defendant who has been charged only with murder is on notice that the trial court may instruct the jury on the charge of manslaughter in the first degree. *State* v. *Rodriguez*, supra, 180 Conn. 399. This court answered this question in the affirmative, because manslaughter is a lesser included offense of murder. Id., 407; see also *State* v. *Tomlin*, supra, 266 Conn. 616–17 ("[t]he constitutionality of instructing on lesser included offenses is grounded on the premise that whe[n] one or more offenses are lesser than and included within the crime charged, notice of the crime charged includes notice of all lesser included offenses" [internal quotation marks omitted]). This court previously has recognized, however, that, although *Rodriguez* properly held that manslaughter in the first degree is a lesser included offense of murder, that ruling provides an *exception* to the ordinary rule that "the greater offense require[s] all of the same elements that the lesser included offense required, plus some additional element or elements"; *Carpenter* v. *Commissioner of Correction*, supra, 290 Conn. 125; because "[m]anslaughter in the first degree based on reckless conduct . . . does not include the same elements as murder." Id.; see also id., 124–25 ("*Rodriguez* . . . did not conform to the previously established [building block] test for determining whether a crime is a lesser included offense"). Indeed, the court in *Rodriguez* expressly recognized that manslaughter in the first degree "requires a different state of mind of the actor than that required for murder"; *State* v. *Rodriguez*, supra, 403; and it "expressly overruled or distinguished case law that would have required the court to treat homicide in accordance with the more limited parameters of building block lesser offenses." *Carpenter* v. *Commissioner of Correction*, supra, 125. In other words, this court in *Rodriguez* held that manslaughter in the first degree is a lesser included offense of murder *despite* the fact that the elements of manslaughter are not included in the elements of murder. *State* v. *Rodriguez*, supra, 405. Thus, as we recognized in *Carpenter*, *Rodriguez* did not abrogate the black letter law that recklessness and intentionality are "mutually exclusive

and inconsistent state[s] of mind."[19] (Internal quotation marks omitted.) *Carpenter* v. *Commissioner of Correction*, supra, 126.

Accordingly, unlike the situation where a jury returns guilty verdicts on both a greater offense and a lesser included offense that conform to the ordinary "building block" test, when a jury returns guilty verdicts on manslaughter in the first degree and murder, the jury has not necessarily found all of the elements of manslaughter in the first degree. Rather, as we have explained, the jury has acted illogically by finding mutually inconsistent states of mind, and there simply is no way for a reviewing court to know which verdict the jury found to be supported. See *State* v. *King*, supra, 216 Conn. 594. Accordingly, although manslaughter in the first degree is a lesser included offense of murder under *Rodriguez*, because the states of mind required by the two offenses are mutually exclusive, the rule of *King*—that when a jury returns inconsistent verdicts both verdicts must be vacated—applies.[20] See id., 594–95. We therefore reject this claim.

## II

We next address the defendant's claim that the trial court improperly permitted the state to present evidence of prior uncharged misconduct.[21] We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. On September 6, 2012, after reading a newspaper article about the shooting death of the victim in the present case, Pamela Febles provided a statement to the Norwich Police Department. Febles stated that, starting some time in 1995, she and the defendant lived together for one year. During that time, the defendant was jealous and controlling and subjected Febles to mental and physical abuse. Approximately one month before she moved out of their shared residence, Febles arrived home late after an office Christmas party. When she entered the residence, the defendant rushed toward her, pinned her against a wall and held a Glock handgun to her head.

During the trial, the defendant filed a motion in limine to preclude the state from making any reference to the incident involving Febles. The defendant contended that the evidence constituted inadmissible propensity evidence under § 4-5 (a) of the 2012 edition of the Connecticut Code of Evidence.[22] The state contended that, to the contrary, the evidence was admissible under § 4-5 (c)[23] because the state intended to use it to establish the defendant's intent and to rebut his claim that the victim's death was the result of a mistake or an accident.

The trial court concluded that the evidence was admissible because it was relevant to prove intent and the absence of a mistake or an accident. The court noted that there were "substantial similarities between the prior conduct and the conduct at issue here. Specifi-

cally, the conduct occurred in the context of a domestic dispute, the conduct involved a firearm . . . and . . . there were allegations of bruising in both situations." The court also found that, "even though the Febles incident occurred approximately [fourteen] years prior to the events in question here, that time frame does not preclude the state's inquiry . . . ."

Thereafter, during cross-examination of the defendant, the prosecutor described the incident involving Febles and asked the defendant if he recalled it. The defendant testified that he did not. He admitted, however, that he had had a relationship with Febles and that they eventually had broken up. On redirect examination, the defendant testified that he purchased the Glock handgun with which the victim was killed in 2000 and he did not own a Glock handgun in 1995. The trial court instructed the jury that it could consider the evidence concerning the incident with Febles only to the extent that it bore on the absence of mistake or accident.

With this background in mind, we turn to the legal principles governing the defendant's claim that the evidence concerning the incident involving Febles was inadmissible propensity evidence.[24] "In order to determine whether [evidence of prior misconduct] is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 661, 835 A.2d 895 (2003).

"Because intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon." *State* v. *Baldwin*, 224 Conn. 347, 355, 618 A.2d 513 (1993). Evidence of uncharged misconduct is particularly probative on the issue of intent when the uncharged misconduct is similar to the charged conduct. Id.; see also *State* v. *Tucker*, 181 Conn. 406, 415, 435 A.2d 986 (1980) (evidence of uncharged misconduct may be used to establish "a pattern of behavior and an attitude . . . that is indicative of the defendant's state of mind").

In the present case, the defendant claims that the probative value of the purported evidence[25] concerning the incident involving Febles was outweighed by its prejudicial effect. Specifically, he contends that Febles' statement to the police was unreliable because it was given seventeen years after the incident and she had

never reported the incident before that time. The defendant further contends that, even if the incident occurred, it was too remote in time to be relevant. Finally, he claims that the evidence was unreliable and prejudicial because there was no evidence that he owned a Glock handgun in 1995.

We conclude that the trial court did not abuse its discretion when it allowed the state to question the defendant about the incident involving Febles. The evidence was relevant to prove intent and the absence of mistake or accident because of the substantial similarities between the incidents. Specifically, in both incidents, a woman with whom the defendant was romantically involved had been absent from the residence that they shared under circumstances that caused the defendant to become upset and then, after the woman returned to the residence, the defendant produced a Glock handgun. Given these similarities, if the jury believed Febles' account that the defendant intentionally pinned her to the wall and held the gun to her head, it reasonably could have inferred that he followed the same pattern of behavior during the argument with the victim. Thus, the jury reasonably could have concluded that the evidence rebutted the defendant's testimony that the gun accidentally discharged while he was trying to put it in his bag.

We further conclude that, given the strong similarities between the two incidents and the strongly aberrational nature of the defendant's conduct—producing a gun during an argument with a domestic partner—the fourteen year gap between the incidents of misconduct did not render the evidence of the incident involving Febles irrelevant. With respect to the defendant's claim that the evidence was unreliable because Febles never reported the incident to the police before she gave the statement in 2012, the defendant does not provide the evidentiary basis for this representation. In any event, even if that is the case, Febles' failure to report the incident to the police immediately would not render the evidence inadmissible, but would be grist for the jury mill.

Finally, with respect to the defendant's claim that there was no evidence that he owned a Glock handgun in 1995, Febles' statement that he threatened her with a Glock handgun was, in and of itself, evidence that the jury was free to credit or discredit in light of the defendant's denial that he owned such a gun at the time that he was involved with Febles.[26] Moreover, even if the jury did not believe Febles' statement on that point, that would not render her statement irrelevant or unduly prejudicial because the brand of the gun that the defendant held to Febles' head was tangential to the evidence of the assault. Accordingly, we reject this claim.[27]

The judgment is reversed and the case is remanded to the trial court with direction to vacate the legally

inconsistent guilty verdicts of murder and manslaughter in the first degree with a firearm and to grant the defendant's motion for a new trial.

In this opinion PALMER, EVELEIGH, ESPINOSA, ROBINSON and VERTEFEUILLE, Js., concurred.

[1] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[2] The defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3).

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] At oral argument before this court, the state conceded that its sole theory in support of the murder charge was that the defendant intended to kill the victim when he shot her.

[5] General Statutes § 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."

[6] General Statutes § 53a-3 (13) provides: "A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ."

[7] In *State* v. *King*, supra, 216 Conn. 592, the jury rendered legally inconsistent verdicts of attempted murder and assault in the first degree after the trial court instructed the jury that the defendant could be convicted of both charges. This court concluded that both convictions must be vacated because it had "no way of knowing whether a properly instructed jury would have found the defendant guilty of attempted murder or assault in the first degree." Id., 594. Although there was no such improper jury instruction in the present case, the same problem arises. We simply have no way of knowing whether the jury believed that the defendant acted recklessly and, therefore, improperly convicted him of murder or, conversely, the jury believed that he had acted with the specific intent to kill the victim and improperly convicted him of manslaughter in the first degree. Accordingly, *King* applies equally here. See *People* v. *Spears*, 112 Ill. 2d 396, 410, 493 N.E.2d 1030 (1986) (when trial court failed to give any instruction regarding potentially inconsistent verdicts, trial court could "not properly enter judgment on one or more of the verdicts and vacate the others" because trial court "may not usurp the function of a jury by second-guessing which of the two verdicts was intended by the jury and which was a result of some misconception" [internal quotation marks omitted]); *People* v. *Gallagher*, 69 N.Y.2d 525, 530, 508 N.E.2d 909, 516 N.Y.S.2d 174 (1987) (when trial court failed to give any instruction regarding potentially inconsistent verdicts, new trial was required because "it is impossible to determine what if anything the jury decided on the issue of [the] defendant's mental state at the time of the offense").

[8] Because *Kitchens* bars appellate review of a claim of instructional error only if the party raising the claim was required to request a jury instruction and failed to do so; see *State* v. *Kitchens*, supra, 299 Conn. 466; the defendant's claim that he was not required to request a jury instruction in the present case is reviewable.

[9] See, e.g., *State* v. *King*, 321 Conn. 135, 139, 136 A.3d 1210 (2016) (defendant raised claim of legally inconsistent verdicts by filing motion for new trial); *State* v. *Williams*, 237 Conn. 748, 752–53, 679 A.2d 920 (1996) (addressing defendant's claim of legally inconstant verdicts without specifying whether claim was raised in trial court or preserved for review); *State* v. *Nash*, supra, 316 Conn. 658 and n.8 (unpreserved claim of legally inconsistent convictions reviewed pursuant to *State* v. *Golding*, 213 Conn.

233, 239–40, 567 A.2d 823 [1989]); *State* v. *Hinton*, 227 Conn. 301, 313, 630 A.2d 593 (1983) (when defendant neither objected to jury instructions on offenses with mutually exclusive states of mind nor objected to trial court's acceptance of verdicts, court reviewed unpreserved claim pursuant to *Golding*); *State* v. *King*, supra, 216 Conn. 592 n.9 (defendant claimed on appeal that trial court improperly denied his motion to dismiss or elect counts and his motion for new trial and improperly instructed jury, and this court held that "[t]his claim [of legally inconsistent verdicts] was raised sufficiently at trial to alert the [trial] court to the problem of inconsistent verdicts and was consequently preserved for appeal"); *State* v. *Lokting*, 128 Conn. App. 234, 237, 16 A.3d 793 (defendant raised claim of legally inconsistent verdicts by filing postverdict motion for judgment of acquittal), cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011); *State* v. *Hazel*, 106 Conn. App. 213, 222, 941 A.2d 378 (reviewing unpreserved claim of legally inconsistent verdict pursuant to *Golding*), cert. denied, 287 Conn. 903, 947 A.2d 343 (2008); *State* v. *Green*, 81 Conn. App. 152, 155, 838 A.2d 1030 (defendant raised claim of legally inconsistent verdicts by filing preverdict motion for judgment of acquittal), cert. denied, 268 Conn. 909, 845 A.2d 413 (2004); *State* v. *Bjorklund*, 79 Conn. App. 535, 564, 830 A.2d 1141 (2003) (defendant raised claim of legally inconsistent verdicts by filing motion in arrest of judgment), cert. denied, 268 Conn. 920, 846 A.2d 882 (2004); *State* v. *Kuranko*, 71 Conn. App. 703, 713, 803 A.2d 383 (2002) (addressing defendant's claim that verdicts were legally inconsistent without specifying whether claim was raised in trial court or preserved for review); *State* v. *Jones*, 68 Conn. App. 562, 566, 792 A.2d 148 (defendant raised claim of legally inconsistent verdicts by filing motion for new trial), cert. denied, 260 Conn. 917, 797 A.2d 515 (2002); *State* v. *Morascini*, 62 Conn. App. 758, 761, 772 A.2d 703 (defendant raised claim of legally inconsistent verdicts by objecting at close of evidence to state's request to submit both charges to jury), cert. denied, 256 Conn. 921, 774 A.2d 141 (2001); *State* v. *Mooney*, 61 Conn. App. 713, 719, 767 A.2d 770 (reviewing unpreserved claim of legally inconsistent verdicts pursuant to *Golding*), cert. denied, 256 Conn. 905, 772 A.2d 598 (2001); *State* v. *Hawthorne*, 61 Conn. App. 551, 554, 764 A.2d 1278 (2001) (addressing defendant's claim that verdicts were legally inconsistent without specifying whether claim was raised in trial court or preserved for review); *State* v. *Harris*, 54 Conn. App. 18, 22, 734 A.2d 1027 (defendant raised claim of legally inconsistent verdicts by filing motion for new trial), cert. denied, 250 Conn. 925, 738 A.2d 660 (1999).

We recognize that, in *State* v. *King*, supra, 216 Conn. 595, after finding that the verdicts were legally inconsistent, this court directed that, in the new trial on remand, "the trial court *must* instruct the jury that, depending on its findings of fact, it may convict the defendant of one count or the other, but not of both." (Emphasis in original.) The court in *King* did not suggest, however, that requesting such an instruction is the only proper procedure for raising such a claim and, in the twenty-seven years since *King* was decided, the decision has never been interpreted in that manner.

[10] We emphasize that the court in *Delgado* held that the trial court's *acceptance* of legally inconsistent verdicts constituted plain error, not the court's failure to instruct the jury on the issue. *People* v. *Delgado*, supra, 2016 WL 7009119, *3. This supports the defendant's position that legally inconsistent verdicts simply cannot be anticipated because they are inherently illogical. Indeed, this court has held that legally inconsistent verdicts violate the defendant's constitutional due process right to *notice* of the nature of the charges against him. See *State* v. *King*, 321 Conn. 135, 147–49, 136 A.3d 1210 (2016) (when state tries case on theory that multiple offenses requiring mutually inconsistent states of mind relate to same act and same result, convictions on both charges would constitute violation of due process requirement that defendant be notified of charges against him). If the defendant is not on notice that he *may* be convicted of multiple charges requiring mutually inconsistent mental states, the state and the trial court necessarily are on notice that the defendant *may not* be convicted of the offenses.

[11] See also *Robbins* v. *Van Gilder*, 225 Conn. 238, 252, 622 A.2d 555 (1993) ("the same sauce [that the plaintiff] attempted to spread on the defendants' goose also necessarily graced his own gander").

[12] We again emphasize, however, that the burden is not on the defendant to request an instruction that he may not be convicted of multiple offenses requiring mutually exclusive states of mind and the defendant's failure to do so does not render a postverdict claim of inconsistent verdicts unreviewable. Similarly, although the state is not required to request a jury instruction that the defendant may be convicted of multiple offenses requiring mutually

exclusive mental states when the charging document and the state's presentation of evidence are sufficient to put the defendant on notice that the charges relate to different acts and results, the better practice is to give such an instruction in the court's initial charge.

[13] Several other states follow this procedure when a jury has rendered legally inconsistent verdicts. See *Coba* v. *Tricam Industries, Inc.*, 164 So. 3d 637, 644 (Fla. 2015) (party claiming inconsistency must raise issue before jury is discharged and ask trial court to reinstruct jury and send it back for further deliberations); *Givens* v. *State*, 449 Md. 433, 466–67, 144 A.3d 717 (2016) (same; citing cases).

[14] General Statutes § 52-223 provides: "The court may, if it judges the jury has mistaken the evidence in the action and has brought in a verdict contrary to the evidence, or has brought in a verdict contrary to the direction of the court in a matter of law, return them to a second consideration, and for the same reason may return them to a third consideration. The jury shall not be returned for further consideration after a third consideration." Section 52-223 and that statute's predecessors have been applied in both civil and criminal cases. See *State* v. *DiPietro*, 120 Conn. 537, 539, 181 A. 716 (1935) (under predecessor to § 52-223, "the court may refuse to accept [a verdict in a criminal case] if it is not in proper form or otherwise imperfect, or it may refuse to accept it for the time being and return the jury to a second or even a third consideration of the case"); *State* v. *Dougherty*, 38 Conn. Supp. 400, 404, 450 A.2d 870 (App. Sess. 1982) (trial court properly applied § 52-223 in criminal case).

[15] In addition to implicating the constitutional due process right to notice of the nature of the charges against a defendant; see footnote 10 of this opinion; legally inconsistent guilty verdicts implicate the constitutional due process right to proof beyond a reasonable doubt of every element of the charged offense. See *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) ("the [d]ue [p]rocess [c]lause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). This is because, when a jury renders legally inconsistent guilty verdicts, each verdict negates an element of the other verdict and it is impossible to know which verdict the jury found to be supported by the evidence. *State* v. *King*, supra, 216 Conn. 594.

[16] As we have indicated, to avoid the risk that the trial court may vacate both guilty verdicts upon the defendant's filing of a motion for a new trial, the state is free to object to the legally inconsistent verdicts before the jury is discharged and to request further consideration by the jury pursuant to § 52-223. In addition, the state is free to request a jury instruction on the issue.

[17] The state contends that, although it did not present its case on the theory that the charges related to two separate acts and two separate results, the defendant introduced this theory when he contended that the shooting was accidental or the result of his carelessness and negligence. The defendant merely argued, however, that the firing of the gun was not intentional. Neither he nor the state ever suggested that, if the jury agreed with the defendant on that point, there was *other* intentional conduct that could provide the basis for a murder conviction.

[18] The defendant contends that manslaughter in the first degree with a firearm is not a lesser included offense of murder because the use of a firearm is not an element of murder. This court has followed the cognate pleadings approach to lesser included offenses, however, which "does not insist that the elements of the lesser offense be a subset of the higher offense. It is sufficient that the lesser offense have certain elements in common with the higher offense, which thereby makes it a cognate or allied offense even though it also has other elements not essential to the greater crime." (Internal quotation marks omitted.) *State* v. *Tomlin*, 266 Conn. 608, 618, 835 A.2d 12 (2003). As we have indicated, in the present case, it is clear that the parties tried the case on the understanding that the defendant was being charged with murder in connection with the act of discharging the gun. Accordingly, we conclude that, under these circumstances, the charge of manslaughter in the first degree with a firearm was a lesser included offense of the murder charge. As we discuss in the body of this opinion, however, that does not mean that the guilty verdicts were consistent.

[19] The court in *Carpenter* stated that "there is some tension between [the holding of *Rodriguez* that manslaughter in the first degree is a lesser included offense of murder] and case law in which we have reversed convictions, arising out of the same act, of both a crime requiring recklessness and a crime requiring intentional conduct because of their mutually exclusive and

inconsistent state[s] of mind." (Internal quotation marks omitted.) *Carpenter* v. *Commissioner of Correction*, supra, 290 Conn. 126. The court then resolved this apparent tension by observing that, although a defendant cannot simultaneously possess *both* intents with respect to the same act, the inconsistency of the mental states does not create a constitutional notice problem when a defendant has been charged only with an intentional crime because the defendant is presumed to know that the "same factual circumstances [may] support a jury finding of *either* intentionality *or* recklessness." (Emphasis added; internal quotation marks omitted.) Id., 126–27. We now recognize that it would have been more accurate to state that the same *evidence* may support either state of mind instead of referring to the "same *factual circumstances*," because the defendant's state of mind *is* a factual circumstance to be determined by the jury on the basis of the evidence.

[20] The state also relies on this court's statement in *State* v. *Giguere*, 184 Conn. 400, 404 n.2, 439 A.2d 1040 (1981), that, "[w]hen recklessness suffices to establish an element [of an offense], such element also is established if a person acts purposely or knowingly." (Internal quotation marks omitted.) Again, we are not persuaded. The defendant in *Giguere* claimed that he had been improperly convicted of assault in the first degree because the evidence showed only that he acted intentionally, not recklessly. Id., 403. This court ultimately concluded, however, that the evidence was sufficient to support a finding that the defendant had acted recklessly, as that term is statutorily defined. Id., 404. Accordingly, the statement that the defendant relies on was dictum. Moreover, our research has revealed no other Connecticut cases that have relied on this dictum to support the proposition that proof of intentionality establishes recklessness. We therefore conclude that, to the extent that the statement in *Giguere* supports the proposition that a defendant logically and consistently may be convicted of *both* a reckless offense and an intentional offense related to the same act and the same result, it is inconsistent with *State* v. *King*, supra, 216 Conn. 595, and we now disavow it. See id., 593–95 (because recklessness and intentionality are mutually exclusive states of mind, defendant may be convicted either of reckless offense or of intentional offense, but not both, when offenses relate to same act and same result).

[21] Although our conclusion in part I of this opinion that the defendant is entitled to a new trial is dispositive, we address this claim because it has been raised and fully briefed and it is likely to arise on remand. See *State* v. *Leniart*, 166 Conn. App. 142, 197, 140 A.3d 1026 (addressing defendant's claim that trial court abused its discretion in admitting evidence of uncharged misconduct because issue was likely to arise on remand), cert. granted, 323 Conn. 918, 150 A.3d 1149 (2016).

[22] Section 4-5 (a) of the 2012 edition of the Connecticut Code of Evidence provides: "Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity or criminal tendencies of that person except as provided in subsection (b)." Conn. Code Evid. § 4-5 (a), available at http://jud.ct.gov/Publications/Code2000.pdf.

[23] Section 4-5 (c) of the 2012 edition of the Connecticut Code of Evidence provides: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." Conn. Code Evid. § 4-5 (c), available at http://jud.ct.gov/Publications/Code2000.pdf.

[24] We note that, technically, the state did not offer any evidence that the prior misconduct involving Febles occurred. Rather, the prosecutor questioned the defendant about the incident, and the defendant testified that he did not remember it. See *State* v. *Mucha*, 137 Conn. App. 173, 203, 47 A.3d 931 ("statements and argument of counsel are not evidence"), cert. denied, 307 Conn. 912, 53 A.3d 998 (2012). If the evidence concerning the incident involving Febles was inadmissible under § 4-5 (a) of the Connecticut Code of Evidence; see footnote 22 of this opinion; however, it would have been improper for the prosecutor to ask the defendant about it. See *United States* v. *Woods*, 486 F.2d 172, 175 (8th Cir. 1973) (when prosecutor asked witness whether he was under indictment by prosecutor's office, prosecutor acted improperly by "inject[ing] into the trial prejudicial matter which is obviously not admissible"). Moreover, the trial court and the parties treated the exchange between the prosecutor and the defendant as if it were evidence that the incident involving Febles occurred. Accordingly, it is appropriate for us to address the question of whether evidence of the incident was admissible.

[25] See footnote 24 of this opinion. Because the trial court's ruling denying the defendant's motion in limine related to the information contained in Febles' statement to the police, and because we are addressing this issue because it may arise on remand, all subsequent references to the "evidence" in this opinion are to Febles' account of the 1995 incident, and not solely to the prosecutor's characterization of that account while questioning the defendant at the first trial.

[26] The defendant appears to suggest that his inability to cross-examine Febles about the brand of the gun that she claims he held to her head rendered the evidence unduly prejudicial. The defendant's inability to cross-examine Febles presents a different issue, however, than the issue of whether the evidence of prior misconduct was admissible to prove intent or absence of mistake or accident. Specifically, the defendant's inability to cross-examine Febles implicates his rights under the confrontation clause of the sixth amendment. Because the defendant has raised no claim under the confrontation clause on appeal, we express no opinion as to whether allowing the prosecutor to question the defendant about Febles' statement without providing an opportunity for the defendant to cross-examine Febles violated that constitutional provision or whether the defendant waived that right.

[27] The concurring justice concludes that the trial court abused its discretion when it ruled that the evidence concerning the incident with Febles was admissible because: (1) the prior misconduct occurred fourteen years before the charged conduct; and (2) the prior misconduct was not against the victim of the charged misconduct and it did not involve a completed crime. Indeed, the concurrence suggests that it is an abuse of discretion to admit prior misconduct evidence to prove intent or the absence of accident or mistake *whenever* the latter circumstances are present. We conclude that there is no basis in the law of this state for such a conclusion, at least not in cases in which the defendant has claimed that the harm to the victim was not intentional. Rather, we conclude that when, (1) under circumstances that are similar to those involved in the case under review, (2) a defendant has threatened a person who is similar to the victim in the case under review (3) with harm that is similar to the harm inflicted on that victim, a fact finder reasonably could conclude that the defendant has displayed a particular "pattern of behavior and an attitude . . . that is indicative of the defendant's state of mind" during the commission of the charged offense. *State* v. *Tucker*, supra, 181 Conn. 415; see also *Johnson* v. *State*, 204 So. 3d 763, 769 (Miss. 2016) (when defendant who was charged with committing aggravated domestic violence on former wife claimed that he acted in self-defense, trial court properly admitted evidence that he had threatened to kill his former wife with gun, and later threatened to kill a former girlfriend, to show intent, motive and plan because "the prior assaults all were against women, where he was the aggressor . . . he had initiated the contact [and] he had a prior relationship with all of the women"). Indeed, the fact that a threat is not a "completed crime" in the sense that the defendant has actually inflicted physical injury on the threatened person does not mean that the threat does not reveal a violent, and potentially criminal, state of mind. Accordingly, we cannot conclude that evidence of a prior threat is inadmissible to prove intent or the absence of mistake or accident merely because the threat did not rise to the same level of violence or criminality as the defendant's alleged conduct in the case under review, although the defendant is certainly free to argue that his past conduct shows that he does not carry out his threats. Cf. *State* v. *Beavers*, 290 Conn. 386, 404, 963 A.2d 956 (2009) (admissibility of evidence of prior misconduct to prove intent of defendant charged with arson "does not depend on whether he actually [completed any prior acts of arson]; his comments about wanting to set [a] fire, as well as his threats [to his former wife, while they were married, to burn down their house] . . . are equally probative of his intent" to commit arson by burning down house that he shared with his mother).

With respect to the fourteen year lapse of time, while we agree with the concurrence that this raises the question of whether the conduct was too remote in time to be relevant, we see no reason to adopt a bright line time limitation and we are satisfied, for the reasons stated in the body of this opinion, that the trial court's conclusion that the Febles incident was not too remote did not constitute an abuse of discretion. See *Johnson* v. *State*, supra, 204 So. 3d 769 (evidence of threat to kill former wife thirteen years before charged assault on most recent wife was admissible to show intent). Accordingly, we conclude that the trial court here did not abuse its discretion when it determined that the jury reasonably could conclude that the evidence that the defendant had previously threatened to shoot a domestic partner

in the head with a Glock handgun during an argument tended to rebut the defendant's claim that the victim in the present case was shot in the head during an argument with the defendant when the Glock handgun that he was holding accidentally discharged as he was attempting to place it in his bag.

---